Good morning, Your Honor. I would like at this time to request five minutes for rebuttal. At the conclusion of the opinion, the board notes that their opinion is in fact based on the evidence of the record, but this statement really is not true. When one analyzes both the record and the board's opinion, one sees that the evidence that was introduced by the examiner throughout the prosecution and as well by the applicant addressed specifically the issue of whether or not aspirin was merely the Spanish word for aspirin. And as the board found, the evidence that was introduced into the record was conflicting. It was applicant and only applicant who introduced an actual written dictionary definition, a printed dictionary definition. The evidence introduced by the examiners were merely translations found online using websites that introduced automated computer-based translations. So the only actual evidence of record with respect to the meaning of the word aspirin in Spanish was that submitted by the applicant, which showed that the general perception in Spanish was the term is a registered trademark of knowledge. Applicant also introduced numerous registrations as well. Wasn't there evidence on the other side? You do correctly point to evidence indicating that there's a trademark connection. But also, there certainly seemed to be a fair amount of dictionary information that this is the Spanish word for aspirin. Again, the evidence that was introduced by the examiner were merely online translations. No actual dictionary definition was submitted by the examiner. So the board, when it had the opportunity to review the evidence and come to its conclusion, really only had one printed dictionary upon which to rely. Counsel, the ultimate question the board has to decide here is how would the American consumer public view this? If the American consumer public has access to and frequently references these online dictionaries, and they all say aspirin, many of them, at least the four that I'm looking at, say aspirin as the Spanish word for English, does it matter whether technically that's true according to some proper interpretation of the Spanish language or not? Because all we care about is not the truth or veracity of that statement, but whether the consumer public views it as so. I understand that, Your Honor. However, in this instance, these websites that provide these automated translations do so without necessarily any support. And in fact, an applicant has contacted each of the websites that was identified by the examiner and has advised them that the mark is a registered trademark. And in each instance, we have received a response saying, thank you, we will note this and update this accordingly. So that perception may be that those consumers who may in the United States wish to look up the term aspirin, although I'm not sure why anyone in the U.S. would until the applicant's product is actually on the shelves. Well, counsel, before something goes generic, it's a registered trademark, right?  Right. So a dictionary could well have said aspirin and noted it was a, in fact, registered trademark when the world construed it as a generic term for the drug for aspirin, right? So the fact that a dictionary might even acknowledge that it's a registered trademark doesn't mean the consumer public necessarily doesn't view it as descriptive. Right. That's correct, Your Honor. But in this instance, we introduced additional evidence, and the examiner actually failed to introduce the necessary evidence to really support this, their position. There was no evidence of any other competitors using the term aspirin with reference to any analgesic product. Went through newspaper articles or online articles as well in which the word aspirin was used and often referred to without even mentioning that it's a trademark. The online articles that were introduced by the examiner, the majority of the ones initially introduced referenced our client and our client's product specifically. Those that did not reference our client and our client's product amounted to four. There were four articles out of the millions and millions of articles available through the LexisNexis database. There were four that introduced the word aspirin in such a way that it did not appear necessarily to be a registered trademark. Although in one instance, it was used with a capital A as opposed to the remaining text to indicate that or to potentially indicate it was a trademark. And included a hypothetical, which wouldn't be necessary if it was merely a generic or descriptive term. In those instances, as we pointed out to the examiner and in our briefs to the board, those are mere misuses of the mark. When I did work for Popsicle, one of the things that we used to do on a regular basis was to write letters to authors of articles and to any LexisNexis database saying, perhaps you're not aware, but you did not use the mark appropriately. There is policing that is necessary in order to make sure that a mark does not become generic. You're absolutely right. That doesn't necessarily stop it from being descriptive in the public's mind, even though you do a good job of attempting to police. That's correct, but our position is three articles, or four articles if you want to count the fourth one, which is questionable, out of the entire LexisNexis database in and of itself is not sufficient to demonstrate such public perception. Additionally, the board did not base it upon this question as to whether or not the mark is a Spanish word for aspirin. The board totally went off in a different direction and came up with an entirely new theory, namely that it was a misspelling. Was that issue discussed? It seems to me that that's a significant point as to whether they were saying that because this is the translation of a genetic word, you can't register it. But I didn't read their opinion as taking that position like that if you don't read it. Was that an issue before the examiner? It was not, Your Honor. It was never raised by the examiner. It was never raised in front of the trademark office. And it was never raised during the briefing in front of the board. It was only raised once the board itself, in his opinion, went in that direction. And again, there was no evidence in the record dealing with consumer perception having to do with the misspelling, whether or not it was a misspelling or a variation, and whether or not it was protectable as such. Educate me. Is the board allowed to reach the same conclusion as the examiner for a different reason? Or are they bound sort of like an appellate court is by the particular rationality as to the laws? I believe the board is not bound by what the examiner has done. It can reach an independent conclusion if there is substantial evidence to support that conclusion. And in this instance, that evidence was lacking. There was no evidence in public record introduced by the examiner at any time during the prosecution pertaining to the misspelling or variation concept that the board ultimately used as its reasoning for affirming the refusal. What evidence would you have liked them to have introduced? There should have been – well, for example, the only argument that was involved in this case having to do with whether or not aspirin was similar to the term aspirin was that raised by the applicant. An applicant in his office action response specifically stated to the examiner that the marks are different. They have a different pronunciation. They have a different spelling. They have a different consumer perception. That was raised in front of the examiner. The examiner introduced no evidence and no argument contrary to that. So the examiner did nothing to contradict our position that the marks are different, they have a different pronunciation, and therefore would have a different consumer perception. You introduced argument along those lines, but there wasn't any accompanying evidence. Was there on the site's own meaning? There was not. There was not because it was not – in no instance was it raised as an issue by the examiner. We raised it in our response to further differentiate the fact that it wasn't merely the Spanish word for aspirin, stating that it's a totally new word, it's a coined term, it's registered throughout the world, it's throughout all those other countries. It's shown that it's not descriptive because otherwise it would never have been registered in all those countries. Not necessarily, right? It doesn't mean it's not descriptive in the United States. It means it's not descriptive in those particular countries. That is absolutely correct. And even there, can you be sure that all those countries that you're talking about have the same presidential opinions regarding the interpretation of what is and is not descriptive? Well, Your Honor, my assumption would be upon reviewing the treatises concerning the laws of those other countries that they would not permit a generic term. Well, no one accuses you of being generic, right? I mean, I didn't understand – Nor a highly descriptive term. So you're representing to me that the laws of all the other countries in which this is registered necessarily interpret our – in the same exact way we do when something is descriptive. No, Your Honor, I – I didn't think you meant to say that. Not at all. All right. So the fact that it is registered there doesn't mean it necessarily should be here. Not necessarily. And again, the registrations were not introduced to say, look, it's registered here, it should be registered in the U.S. They were introduced merely for the point, the only point that was raised by the examiner, namely that it was the Spanish word for, i.e., either generic or equivalent to, aspirin. Now, so is your argument that Spanish-speaking peoples would know it as a trademark because it's always been a trademark in their nations and most nations, although I saw some gaps on the list, major Spanish-speaking countries. But let's just say that it is a registered trademark in the major Spanish-speaking countries, such that confusion would arise in the United States where treated became generic. Was that – they shouldn't debate it at all. That was something that we introduced, Your Honor, absolutely. But that was the response of the office, right? Yes, Your Honor. I don't believe that they specifically addressed that issue when we raised it. And it was exactly that, that those persons who have emigrated from other countries, those persons whose families have come from those other countries, those other Spanish-speaking countries, where they purchased aspirina, bare aspirina products, are familiar with it as a registered trademark. And thus, in the U.S. – I wasn't asking you to argue the point for us. And let's save the rest of your time for your bubble, and I'm going to ask this question. Thank you, Your Honor. Because the concern, as you can see, when we're talking about likelihood of confusion, protecting the public, it's really public interest, isn't it, that is as well as, of course, the industrial interest of the trademark policy. And I had trouble finding the public interest represented in the board's decisions. Well, I think you have to start out with what the board started out with, Judge Lerner-Kant's decision 85 years ago. It's very unique in this case. Aspirin in the United States is a generic term. It's not generic in Germany. It's not generic – it's registered in Canada. It's registered in Germany and many other countries. That's a very powerful statement, isn't it, for a foreign language derivative, let's say. I'm trying to find a neutral word for what I think anyone looking at it would know what the product is. In view of the combination of the decades in which this has been a primary analgesic, and the products being generic to use, of course, in the United States. I think because aspirin, the pharmaceutical aspirin, is generic in the United States and only in the United States, the board said adding an A to this generic term would not be sufficient to confuse or have consumers see it as a unique product of just one entity. It wasn't sufficient to make it a trademark in the United States, based on the fact that aspirin is such a well-known, well-recognized analgesic. But there was, as I gather, no evidence that any other producer of the chemical compound that is aspirin is promoting it as a proprietary aspirin or even as a non-proprietary aspirin. Well, I don't think that's unusual. It's registered every place else, aside from the United States. Actually, Bayer itself isn't producing it. This isn't an intent to use application. So it's probably not likely that we have a competitor yet selling it with Spanish labeling. Now, what's going to happen when competitors do want to sell aspirin, label it in Spanish in the United States? They're going to be precluded from using the word aspirina if Bayer registers it. Yes, that's what this case is about, of course. And that's the one side of the argument. The other side of the argument is the massive Spanish-speaking population that knows it as a trademark and knows the source. Well, it are briefly indicated that actually, based on the census website, only about 11% of the people in the United States are actually Spanish-speaking. They may come from Spanish... That's a very large number. Well, when you're looking at a term like aspirina, where we're saying 80% of the public knows this as a generic term that means a particular... That's 8%, and the question is, are they to have notions of source in the United States? Do they have everywhere else in the world? Are they going to declare aspirin a generic? It seems to me that that's what it comes down to. You're saying that aspirin is generic, and therefore the translation in every other language is also generic. I find that a very interesting question. I don't know the answer. In the United States, it's a very unique situation. Aspirin is generic in the United States, and people aren't confused by the fact that it's registered anyplace else. It's the same situation with aspirina. They've simply added an A, as the board said, to a generic term, and the Spanish-speaking people are similarly exposed. If you go to any drugstore, you see aspirin. They are aspirin. You see writing aspirin. You see multiple aspirins. So while they may have seen aspirina in a foreign country, in the United States, up until this time, as far as we know, the only thing on the market is aspirin and aspirin. Is there any evidence of what you're just telling us? No, but I don't think... What are you telling us, and how do we know? How do we know what a Spanish-speaking person would think going into a drugstore? Well, the only way we would know would be by a survey. You know, in this case, the evidence that the examiner put on, I think, was actually very strong. There were four online dictionaries showing the meaning of the term, and we had five articles, which clearly showed that the term aspirina would mean aspirin. We're going to get conflicting types of evidence here. When you have a term that's already registered elsewhere in the world, then I think it's likely you're going to see it referred to as a trademark. But you're saying that the office's position is that the public is better protected by allowing anyone to translate, produce the Spanish translation. Absolutely. That's what we're saying. Even though there is no such product on the market at the moment, and even though we are told, and the record does show, registration in at least most Spanish-speaking countries. So we know that no other source of aspirina is available in Spain and most of the South American countries, maybe all. But this is the same situation with aspirin. Aspirin is registered elsewhere as well. It's not sold elsewhere as aspirin. It's not sold in that case. The public has one source of aspirin in other countries. In the United States, there are many sources of aspirin. Does that mean that the translation, if you call it a translation or similar word, necessarily has to be made generic in the United States? That's where I have trouble. Well, I believe it does, because the translation of aspirina is aspirin, and aspirin is generic in the United States. So why would we give one manufacturer the rights to the generic term in the United States? I think maybe because they have the rights worldwide, elsewhere, in the Spanish word, not the English word in the United States. Anyone can sell aspirin in the United States. So if anyone can sell aspirin in the United States, then anyone should be able to sell aspirin in the United States, because it means aspirin. I'm sorry. I just want to make sure that I'm understanding what you're telling us. Is your argument that any translation of the word aspirin would necessarily be descriptive in the United States? Like, for example, suppose the German translation was a word that sounded and looked nothing like the word aspirin. I don't know what it is. I don't speak German. Or pick some other language which does have a translation of the word aspirin, which looks and sounds not at all like the word aspirin in the English language. Is the Patent Office's position that that would therefore be descriptive to the American consumer public, or is your position one which I think is eminently more reasonable – I'm helping you along here, at least from my thinking – eminently more reasonable in terms of this one, because of the very close spelling, not necessarily pronunciation – I thought you jumped the gun on that one a little bit – but spelling and appearance, because of the very closeness of these two words, that the translation ought to be taken into account and matter to the determination of whether it's descriptive. Which of those two are you, or do I have it completely wrong, and it's a third I haven't thought of? The Board's position was that this term, aspirin, is so similar to the generic term, aspirin, that just adding an A and putting it on a drug that is aspirin in the United States would immediately tell the purchaser, when they see it in the drugstore, that it's aspirin. So it's merely descriptive of what the goods are. These goods are analgesics. They're aspirin-based or aspirin analgesics. The doctrine of foreign equivalence, when you apply that doctrine, it means that the word is the same. How do you know that doctrine in trademark law? The doctrine of foreign equivalence, Your Honor. Okay, well, is there a doctrine of foreign equivalence? There is a doctrine of foreign equivalence. If someone is attempting to register a term, a foreign term, and that term, the translation, is merely descriptive or generic in the United States, we would refuse it. It would not have to look like the same term. Give me an example. Are there cases in your briefs? I don't think. I do have some cases. In the decision, I think the Board referred to a case. Is this not an argument that you presented? I'm surprised, too. It sounds to me like what you're saying is according to the Board's normal practice or the Patent Office's normal practice, no matter how different the word looked and no matter how small a segment of the American public speaks this other foreign language, that you all would reject it in the United States as a translation of the generic, regardless of the sight, sound, meaning, or otherwise. Is that right? Is that what you're saying? That's what I'm saying, under the doctrine of foreign equivalence. It would not have to look the same. Okay, but it's a questioning doctrine? No, Your Honor. If you could bear with me, I can refer you to a case. Because you also need to include, I would suppose, if there is something that you might want to call a doctrine which means that it's so firmly and fixably established that it's beyond debate, that whether the foreign equivalent is in fact an original trademark registered in 20 other countries is irrelevant. Those particular facts have never been. I'm not aware of a case where that was the situation. That's the situation here, right? Yes, here that is the situation where this particular term is registered in other countries. But generally, when you're dealing with the doctrine of foreign equivalence, that would not be the case. I'm not aware of a case. Okay, so that's not in your brief, right? No, that point is not in our brief. Can I just impart the way the Board, well, and for the examining attorneys who have decided this case, because certainly part of the analysis was the notion that this is the Spanish word for asking. So while they may not have cited the doctrine directly, obviously your office is relying on it in part. We're relying on that in part, Your Honor. But primarily, what we're relying on, what the Board was saying is that they did not need to reach this doctrine, that it wasn't necessary to base this merely descriptive refusal on the fact that aspirina is the translation for the word aspirin. What the Board said was that this term is so similar to the word aspirin, when used on an aspirin product, the purchaser who confronts this in the marketplace will immediately see the term as describing an aspirin or an analgesic containing aspirin. I'd like to follow up on a question that Judge Moore asked you. Let's say that in other countries, the registered trademark for acetate salicylic acid is salicylic acid, so it doesn't look like aspirin. But it, nonetheless, is so directly connected to the chemical name that at least those who have studied chemistry would say, oh, this is aspirin. Would that have anything, would that make any difference? Would you allow such a registration? I think, Your Honor, under the doctrine of foreign equivalence, it would have influence. Listen, you keep calling it a doctrine. A doctrine means that it's absolutely established beyond debate, and yet it's not even argued by the, not even used. Your Honor, the term, if it were a point term in the foreign language, it would not. Obviously, it's a point term in the foreign language. It would not. Aspirin was a coined term. It was just misused in the United States. It became generic. And it became generic. That's true. It was a coined term which was preserved elsewhere. Elsewhere, but not in the United States. But they're not trying to register aspirin. They're trying to register aspirina. They're trying to register a term that adds one letter to a well-known generic term. This is what the office's position was, what the board said. Simply adding, if you can add the term A to aspirina, then I assume you could add A to penicillin and penicillin up. They're not adding A to aspirin. They're taking a word, which is the registered trademark, that presumably has been used in Spanish-speaking countries perhaps from the beginning. And now they're seeking to register it in the United States based on use. Well, Your Honor, they haven't registered in foreign countries just like they have aspirin registered in foreign countries. But I believe based on – I'm sorry, what did you say? Aspirin is also registered. Aspirin and aspirin are both registered. Except in the United States. Except in the United States. So in the United States, purchasers are used to purchasing aspirin and its generic term. And what the board said in the United States, where aspirin is such a well-known – it was held generic 85 years ago, simply adding an A is insufficient to make it, you know, take it out of the realm of descriptiveness. Okay. Any more questions or exhaustive questions? Thank you, sir. Thank you. Your Honor, just a few points. First of all, I just recently moved to Los Angeles and relocated my first night there into a drugstore and for the first time actually found our client's products, aspirin, on the shelves. But one of the things that I also wanted to note, going back to what the opposing counsel said, I was – This is an attend-to use application. One that was filed numerous years ago. That is correct, Your Honor. The other thing, though, I wanted to point out is that throughout most of the commercial products that we have, especially in places like Los Angeles, Miami, other places where there's a high Spanish-speaking population, there are products that have labeling and instructions that are in more than one language. And that's, as we said, aspirin has been sold for over 100 years in the United States. There was no evidence whatsoever placed into the record that any other manufacturer of aspirin in the United States, any other company that sells aspirin in the United States, in any of its labeling, utilizes the term aspirin. There's no evidence of record that that term is necessary for anyone else to use. It's only used by our client. It's a term that is only used by our client. What if you added an S instead of an A on the end of it with aspirin? I don't know what the appropriate plural for aspirin is. I think it's plural. I think aspirin is plural. It's a bit of aspirin, I don't know. I think it's one of those words where it's its own plural. But suppose it was an S instead of an A. If it was an S instead of an A, I bet you wouldn't find any of your competitors using that word either, right? Or suppose it was a misspelling of aspirin, but phonetically sounded exactly the same. You might not find any of your competitors using the misspelling either, right? Phonetically sounding the same, I believe you would be correct. However, there is case law that specifically says simply because it's a misspelling does not mean it is not registrable. It can be registered. And the case law that was cited in the briefing made reference, for example, actually the case cited by the board, the Coney Island pretzel case, specifically states that in that instance there was a refusal because the term was a phonetic equivalent to a German term. But the board specifically stated that a misspelling could be something that is registrable on the principal register. In this instance, they went on and went to a different theory and said because it's phonetically equivalent, it is the same word, blah, blah, blah. But they did state that it is possible. But misspellings could be registrable. It sort of depends, doesn't it, on the sight, sound, meaning, and other characteristics of the mark as to what is the misspelling. Is it so profound that it's not the same and will have the same impression to the consumer public? That's what we have to look at with regard to the misspelling. Exactly. And it was our argument raised to the examiner that exactly that has a different pronunciation. It's a coin term which has no meaning, so therefore it has a different connotation. And it is spelled differently. Even though it might only be a minor difference in spelling, there is a difference in spelling, pronunciation, and connotation, the three prongs that one looks at to determine whether or not... You look at sight, sound, and meaning. Exactly. Do you think it conveys a different visual impression to the consumer public? I think it can depending on how it's presented, but it is a minor difference. I concede that. Because pronunciation, I agree with you. I thought this word glossed that over. It's four syllables, not two. The emphasis is in either place. The syllables that are the same actually are pronounced the same. Exactly. One of the three I'm with you on in that regard, but I'm not sure that necessarily defeats the substantial evidence is what I'm struggling with. But again, there was no evidence that was introduced that could be relied upon on the issue of misspelling and consumer perception as to whether or not this would be perceived as something which is different than aspirin. There really was nothing put into the file of the application to support the board's finding. Okay. All right. Thank you, Mr. Bobbins. Thank you. This has taken a lot of discussion.